**Lansing, Michigan**

# Opinion

Chief Justice:       Justices:
Robert P. Young, Jr.  Michael F. Cavanagh
                     Marilyn Kelly
                     Stephen J. Markman
                     Diane M. Hathaway
                     Mary Beth Kelly
                     Brian K. Zahra

FILED JUNE 28, 2012

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v                                  No. 141741

RAMON LEE BRYANT,

        Defendant-Appellee.

BEFORE THE ENTIRE BENCH

ZAHRA, J.

This case presents the question whether defendant was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community. A fair-cross-section claim under the Sixth Amendment requires a defendant to make a prima facie case as set forth by the United States Supreme Court in *Duren v Missouri*.[1] Namely, a defendant must show:

[1] *Duren v Missouri*, 439 US 357; 99 S Ct 664; 58 L Ed 2d 579 (1979).

(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.[2]

The Court of Appeals concluded that defendant had satisfied the three *Duren* prongs, establishing a violation of his right to an impartial jury drawn from a fair cross section of the community, and granted defendant a new trial. We conclude that the Court of Appeals erred because defendant failed to show under the second prong that the representation of African-Americans in venires from which juries were selected was not fair and reasonable in relation to the number of African-Americans in the community. The Court of Appeals erred in evaluating the second prong in two significant ways.

First, the Court of Appeals wrongly relied on misleading representation data by considering the representation of African-Americans *only* in defendant's venire when addressing whether representation was fair and reasonable. *Duren* explicitly requires courts to consider the representation of a distinct group in *venires*. The use of this inadequate sample from only defendant's venire caused the tests evaluating the degree of any underrepresentation to produce skewed and exaggerated results.

Second, the Court of Appeals misapplied our decision in *People v Smith*.[3] In *Smith*, we held that an evaluation of the second prong requires courts to employ a case-by-case approach that considers *all* the relevant statistical tests for evaluating the data regarding representation of a distinct group without using any one individual method

---

[2] *Id*. at 364.

[3] *People v Smith*, 463 Mich 199; 615 NW2d 1 (2000).

2

*exclusive* of the others. Contrary to this holding, the Court of Appeals effectively adopted a bright-line rule in favor of the comparative-disparity test in all instances in which the population of the distinct group is small. Given that all the relevant tests have shortcomings, *Smith* requires courts to take a comprehensive view of the degree of underrepresentation without elevating one test over the others. Nonetheless, the Court of Appeals, using a skewed result from the comparative-disparity test, elevated this test above the others in precisely the situation in which its use is most criticized—distorting the degree of underrepresentation when the population of the distinct group is small.

We hold that when applying all the relevant tests for evaluating the representation data, a court must examine the composition of jury pools or venires over time using the most reliable data available to determine whether representation of a distinct group is fair and reasonable.[4] Having considered the results of these tests using the most reliable data set, which included the composition of jury pools or venires over a three-month period, we conclude that defendant failed to show that the representation of African-Americans was not fair and reasonable. Accordingly, we reverse the judgment of the Court of Appeals and reinstate defendant's convictions and sentences.[5]

---

[4] The terms "venire," "jury pool," "jury panel," and "array" are sometimes used interchangeably. See Black's Law Dictionary (9th ed) (defining "venire" as "[a] panel of persons selected for jury duty and from among whom the jurors are to be chosen. — Also termed *array*; *jury panel*; *jury pool*"). Because of this, our references to "venire" are to the group of potential jurors in the courtroom from which a defendant's petit jury are selected and our references to "jury pool" are to the group of people summoned to appear for jury duty on a particular day.

[5] The dissent believes that this opinion engages in unnecessary error correcting. For obvious reasons, we disagree that addressing a *published* Court of Appeals opinion that

3

## I. FACTS AND PROCEDURAL HISTORY

A jury convicted defendant of first-degree criminal sexual conduct, MCL 750.520b(1)(e), armed robbery, MCL 750.529, and possession of marijuana, MCL 333.7403(2)(d). The victim testified that when she attempted to buy crack cocaine from defendant, he put a gun to her head and demanded her money. He then ordered her to perform oral sex on him, taking her car keys and telling her that he would not let her leave until she did so. When the police apprehended defendant, he had marijuana in his possession.

After the jury was selected, but before it was sworn, defendant made a timely objection to the racial composition of his jury venire. The trial court noted that it observed one African-American and one Latino in defendant's 45-person venire, but decided to reserve its ruling on the objection until a hearing the following day.[6]

At the hearing, the jury clerk testified in regard to the procedure for composing jury pools and venires. According to the jury clerk, the Secretary of State provides the court a list of all the residents of Kent County who are at least 18 years of age and have a valid driver's license or valid state identification. From that list, a computer program randomly selects residents to be sent jury questionnaires. The program then randomly

---

misapplied constitutional principles, United States Supreme Court precedent, and our precedent is unnecessary.

[6] Before the court went off the record, an exchange between defense counsel and the trial court showed confusion about whether the individual that the trial court had identified as an African-American member of defendant's venire was actually defendant's step-father.

selects jurors to be summoned using the names of those who responded to the jury questionnaire and had not been disqualified or opted out of jury service because of age.[7]

The jury clerk testified that the Secretary of State database does not include the race of the individuals listed and that the computer program does not account for race when selecting jurors. For the date defendant's jury was selected, January 28, 2002, only 132 of the 182 people who had been randomly selected by the computer program and issued jury summonses appeared for service. By the jury clerk's visual inspection, only one was African-American. Of the 132 appearing, the computer program randomly selected 45 people for defendant's venire. The jury clerk also submitted to the trial court the results of voluntary surveys taken by some of those actually appearing for jury duty on given days in January 2002.[8]

Defendant, relying on the results of the voluntary surveys, argued that the disparity of African-Americans appearing for jury duty compared to the African-American population of the county showed that the current jury-selection method did not include a

---

[7] See MCL 600.1307a (addressing grounds for disqualification and exemption from jury service).

[8] The results, which were contained in a document entitled "Jury Community Representation Survey Compilation," reflect that on January 7, 160 of 169 of those appearing responded, with 2 individuals indicating that they were African-American and 2 indicating that they were multiracial; on January 9, 3 of the 77 potential jurors appearing responded, with none indicating that he or she was African-American; on January 14, 130 of the 140 potential jurors appearing responded, with 2 indicating that they were African-American and 2 indicating that they were multiracial; on January 22, 16 of the 18 potential jurors appearing responded, with none indicating that he or she was African-American and 1 indicating that he or she was multiracial and; on January 23, 52 of the 54 potential jurors appearing responded, with 1 indicating that he or she was African-American.

fair cross section of the community. The trial court ultimately denied defendant's challenge to his venire, ruling that because the jury-selection system was race neutral, the underrepresentation of African-Americans was a function of the voluntary failure of those individuals to participate.

Following his conviction and sentencing, defendant appealed. The Court of Appeals majority affirmed in part, but remanded the case to the trial court for an evidentiary hearing regarding defendant's claim that his venire did not reflect a fair cross section of the community.[9] Addressing whether the representation of the distinct group (African-Americans) was fair and reasonable under *Duren*'s second prong, the majority concluded that defendant had not shown that the representation was not fair and reasonable under the relevant statistical tests.[10] Nonetheless, the majority applied the approach set forth in *People v Hubbard (After Remand)*,[11] in which "the defendant was found to have shown substantial underrepresentation where the disparity resulted from 'non-benign' circumstances; that is, where the underrepresentation did not occur as the result of random chance."[12] Under this approach, the majority assumed that defendant

---

[9] *People v Bryant*, unpublished opinion per curiam of the Court of Appeals, issued March 16, 2004 (Docket No. 241442) (*Bryant I*).

[10] *Id*. at 2-4.

[11] *People v Hubbard (After Remand)*, 217 Mich App 459, 477-478, 481; 552 NW2d 493 (1996).

[12] *Bryant I*, unpub op at 4.

had satisfied the second prong because the evidence indicated the possibility that the underrepresentation was not the result of random selection.[13]

Regarding the third prong, the prosecution admitted that the jury-selection process disproportionately selected jurors from certain zip codes.[14] As a result, the majority remanded the case to the trial court for an evidentiary hearing in which defendant could "present evidence that the Kent County jury selection system resulted in systematic exclusion of African-Americans causing this group to be substantially underrepresented in defendant's jury venire."[15]

On remand, the trial court[16] held several hearings and heard testimony from the court's case manager, the jury clerk, a member of the Kent County Jury Board, and two statistical experts. From this testimony, the trial court found that a computer

---

[13] *Id.*

[14] *Id.*

[15] *Id.* at 5. The Court of Appeals rejected defendant's remaining issues on appeal. *Id.* at 5-7. Judge BORRELLO concurred with the majority on these issues, but dissented with regard to defendant's fair-cross-section claim because he believed that the evidence established sufficient underrepresentation and that the computer error excluding zip codes having larger minority populations constituted systematic exclusion of African-Americans from the venire. *Id.* at 2 (BORRELLO, J., concurring in part and dissenting in part).

[16] This case was reassigned to Judge Dennis Kolenda on remand because Judge David Soet, who had presided over defendant's trial, had retired.

programming error was responsible for the underrepresentation of African-Americans in venires from June 2001 to August 2002.[17]

The trial court found that Kent County, in an effort to save money spent on software fees, switched in April 2001 from using a vendor's software for summoning jurors to software developed by its information technology department. Rather than drawing from the entire database[18] of 456,435 names that the Michigan Secretary of State had provided for Kent County, the new computer program had an erroneous setting using only 118,169 of those names. The program selected randomly who from the list of 118,169 names would be sent jury questionnaires. Because the 118,169 individuals selected came disproportionately from certain zip codes, jury questionnaires were disproportionately sent to those zip codes.[19] This resulted in a disproportionately larger number of jury questionnaires going to zip codes with smaller African-American

---

[17] The frequency with which prospective jurors from certain zip codes were sent jury questionnaires prompted an investigation, which resulted in discovery of the programming error in June 2002, four months after defendant's trial.

[18] As noted in the summary of the jury clerk's testimony, this database included the names and addresses of people shown to have a Michigan driver's license or Michigan personal identification card with an address in Kent County.

[19] The trial court found that the there was no evidence that the underrepresentation of certain zip codes was anything other than the "result of a random draw." There is some evidence, however, that reflects that the original database from the Secretary of State grouped the names by zip code. This discrepancy does not affect our analysis because we conclude in either event that the underrepresentation was inherent in the jury system and thus constituted a systematic exclusion within the meaning of *Duren*'s third prong.

populations and disproportionately fewer questionnaires going to zip codes with larger African-American populations.[20]

For the week that defendant's jury was selected, the court summoned 293 people for jury service. The court specifically summoned 183 of the 293 for January 28, 2002, when defendant's jury was picked. Of the 183 people summoned, 132 appeared and 45 of them were randomly placed in defendant's venire. As noted, the court used voluntary surveys to identify the gender and race of those appearing for jury duty. All 132 potential jurors who appeared on January 28 responded to the voluntary survey, with one individual specifying African-American and one individual specifying multiracial.

Two statistical experts testified at the hearings. First, Dr. Chidi Chidi testified as a statistical expert for defendant. He analyzed the voluntary surveys that potential jurors who appeared completed from 2001 to 2004. Relying on the results of the voluntary surveys, Dr. Chidi concluded that the standard-deviation and comparative-disparity tests proved that there had been systematic exclusion of African-Americans from jury duty. The trial court, however, rejected Dr. Chidi's testimony, finding that Dr. Chidi showed personal bias and a failure to understand basic statistics because he had analyzed only those individuals who opted to answer the voluntary survey after appearing for jury duty.[21]

---

[20] Kent County corrected the error the following month by again hiring an outside vendor and changing the computer program it used.

[21] Defendant summarizes Dr. Chidi's testimony in his brief and asserts without any meaningful analysis that the trial court wrongly rejected the testimony. Our review of the record does not suggest that the trial court's rejection of his testimony amounted to clear

Given its disapproval of Dr. Chidi's testimony, and pursuant to MRE 706,[22] the trial court selected Dr. Paul Stephenson as its expert. Using data from the 2000 Census, Dr. Stephenson conducted his analysis with the assumption that the population of African-Americans old enough to serve as jurors constituted 8.25 percent of Kent County.

From court records, Dr. Stephenson identified the number of jurors summoned from each zip code for each month from January 2002 through March 2002. Dr. Stephenson then used those records and the census data for racial population in each zip code to estimate that, as a result of the zip-code bias, only 163 of the 3,898 summonses (4.17 percent) sent out from January through March 2002 went to African-Americans. If 8.25 percent of the summonses sent out during that period had gone to African-Americans, then 322 African-Americans would have been sent them.

Considering only defendant's venire, Dr. Stephenson calculated that the absolute disparity[23] was 6.03 percent and the comparative disparity[24] was 73.1 percent. However,

_____

error, MCR 2.613(C). Accordingly, we will not consider Dr. Chidi's testimony in our analysis.

[22] MRE 706 permits a court to appoint an expert witness on its own motion.

[23] The absolute-disparity test measures the portion of the overall population of a distinct group that has been excluded by subtracting the percentile representation of that group in jury pools or venires from the percentile representation of that group in the overall population of the relevant community. See part III(B)(2)(a) of this opinion.

[24] The comparative-disparity test measures the decreased likelihood that members of an underrepresented group will be called for jury service and is calculated by dividing the result of the absolute-disparity test by the percentage of the distinct group in the overall population of the community. See part III(B)(2)(b) of this opinion.

10

Dr. Stephenson disregarded the results of these tests, explaining in his report that because of the small population of African-Americans in Kent County, the absolute-disparity test could not identify whether the underrepresentation was statistically significant. He further explained that small changes of representation in the venire had the effect of distorting the result of the comparative-disparity test.

Dr. Stephenson also considered the standard-deviation test,[25] but rejected the use of this test because "the normal approximation is not valid . . . ."[26] Dr. Stephenson, however, applied a test analogous to the standard-deviation test, calculating the binomial distribution to determine whether the venire-selection process was valid.[27] From this calculation, Dr. Stephenson concluded that there was insufficient evidence to find that African-Americans were significantly underrepresented in defendant's venire because even if there had been no bias in how the summonses were sent out, 10.477 percent of randomly selected venires would have had one or no African-Americans. In Dr. Stephenson's view, this likelihood was sufficient for the disparity in African-American representation to be statistically insignificant, but this conclusion was related to the small sample size when examining just defendant's venire.

---

[25] The standard-deviation test measures the probability that the degree of underrepresentation could be the result of random chance. See part III(B)(2)(c) of this opinion.

[26] The standard-deviation test uses a normal approximation of a binomial random variable. Dr. Stephenson indicated that the sample size was not large enough for the test given the proportion of African-Americans in the community.

[27] This analogous test used the "exact" binomial distribution.

11

Examining the larger three-month sample, Dr. Stephenson performed further calculations using the binomial results to find that there was essentially "no chance" that the reduced numbers of African-Americans in jury pools between January and March 2002 occurred as a result of random chance. Further, a venire selected during the time the zip-code problem occurred was approximately four times more likely to contain no more than one African-American than if this problem had not been present. He concluded that if the estimates matched actual practice, "a systematic bias did exist in the selection of individuals summoned for jury duty . . . [that] inevitably led to the under representation" of African-Americans in the jury pools from January through March 2002.

In a written opinion, the trial court ruled that defendant was not entitled to a new trial because he had failed to satisfy *Duren*'s second and third prongs. Addressing whether the representation of African-Americans was fair and reasonable, the trial court reasoned that there was no proof of actual underrepresentation in the group of individuals that the computer program identified and to whom jury questionnaires were sent because the Secretary of State database does not identify race.[28] In the trial court's view, comparing an estimate of how many African-Americans were sent questionnaires and

---

[28] The trial court only considered this group of individuals, not the resulting pools because the pools were affected by considerations for which the court was not responsible such as racial disparities in whether the questionnaire was delivered, response rates, disqualifications, hardships, and people who failed to appear.

how many would have been sent questionnaires absent the computer program flaw was not sufficient because hard data is required under *Smith*.[29]

The trial court also concluded that there was no systematic exclusion under *Duren*'s third prong because there was no evidence that the defective computer setting had any bias. Rather, it simply randomly reduced the number of individuals whom jurors were selected from. Therefore, the end result—that these individuals were taken disproportionately from certain zip codes—was not inherent in the court's jury-selection processes.

On defendant's second appeal, the Court of Appeals concluded in an authored opinion that defendant had established a violation of the Sixth Amendment's fair-cross-section requirement and reversed and remanded the case for a new trial.[30] The panel referred to each of the tests generally used to measure whether representation of a distinct

---

[29] *Smith*, 463 Mich 199. The trial court read *Smith* for the holding that statistical estimates are mere speculation, insufficient to show underrepresentation. As we discuss, the trial court misapprehended *Smith* on this point. As an alternative rationale, the trial court concluded that even if *Smith* did permit statistical estimates, these estimates had a marginal value because of the many variables involved in their accuracy and defendant could not prove his claim because no hard data included what percentage of African-Americans were sent jury questionnaires. As an additional alternative rationale, the trial court concluded that even if statistical estimates could satisfy the second prong, defendant failed to show that the representation was not fair and reasonable because he was not actually the victim of underrepresentation in his particular venire. In particular, the trial court found that it was not statistically significant that there was only one African-American in defendant's venire because such a result would occur 10 percent of the time even if the pools had been derived without the zip-code problem.

[30] *People v Bryant*, 289 Mich App 260; 796 NW2d 135 (2010) (*Bryant II*).

group is fair and reasonable, purportedly following the case-by-case approach set forth in *Smith*.[31]

First, relying on Dr. Stephenson's calculations for only defendant's venire, the panel stated that the absolute disparity was 6.03 percent. Although acknowledging that such a result does not indicate substantial underrepresentation, the panel declined to find the absolute-disparity test controlling because it viewed it as an ineffective measure of acceptable disparity in circumstances, like this one, in which the group in question makes up a small percentage of the total population.[32]

Next, the panel addressed the comparative-disparity test and acknowledged the difficulties in applying this test to a group that makes up a small percentage of the population.[33] Nonetheless, the panel decided that the comparative-disparity test was the most appropriate to measure the underrepresentation in cases in which the percentage of the distinct group in the population is low.[34] Relying on Dr. Stephenson's calculations for only defendant's venire, the panel stated that the comparative disparity was 73.1 percent, which it viewed as a significant disparity and "sufficient to demonstrate that the

---

[31] *Id*. at 267.

[32] *Id*. at 269.

[33] *Id*. at 269-270.

[34] *Id*. at 270-271. On this point, the panel relied on *United States v Rogers*, 73 F3d 774, 777 (CA 8, 1996), which concluded that "the comparative disparity calculation provides a more meaningful measure of systematic impact *vis-a-vis* the 'distinctive' group: it calculates the representation of African Americans in jury pools relative to the African-American[s] [in the] community rather than relative to the entire population."

14

representation of African-Americans in the venire for defendant's trial was unfair and unreasonable."[35]

In addition, the panel briefly addressed the standard-deviation test. It concluded that because Dr. Stephenson testified that the test was not appropriate because the normal approximation was not valid and no court has accepted the standard-deviation analysis as determinative in this type of challenge, it had little value here.[36]

Addressing the third prong from *Duren*, the panel held that the underrepresentation was caused by the systematic exclusion of African-Americans.[37] The panel concluded that the underrepresentation in this case was inherent in the Kent County jury-selection process in which a computer programming error resulted in overselection of jurors from zip codes with small minority populations and underselection of jurors from zip codes with large minority populations. Further, the evidence showed that this underrepresentation occurred over a significant period of time.[38] Therefore, because defendant established a prima facie case for a fair-cross-section claim under the Sixth Amendment that the prosecution failed to rebut, the panel reversed and remanded for a new trial.[39]

---

[35] *Bryant II*, 289 Mich App at 271. The panel concluded that the 73.1 percent comparative disparity was sufficient to demonstrate an unfair and unreasonable representation because it was substantially higher than the 30 or 40 percent that has been deemed sufficient in other cases. *Id*. at 271-272.

[36] *Id*. at 272-273.

[37] *Id*. at 274.

[38] *Id*. at 273-275.

[39] *Id*. at 275-276.

The prosecution sought leave to appeal in this Court, which we granted.[40]

## II. STANDARD OF REVIEW

Whether defendant was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community is a constitutional question that we review de novo.[41] We review the factual findings of a trial court for clear error, which exists "if the reviewing court is left with a definite and firm conviction that the trial court made a mistake."[42]

## III. ANALYSIS

### A. FAIR-CROSS-SECTION JURISPRUDENCE

The Sixth Amendment of the United States Constitution guarantees a defendant the right to be tried by an impartial jury drawn from a fair cross section of the

---

[40] *People v Bryant*, 489 Mich 924 (2011) (*Bryant III*). Our order stated in part:

> The parties shall include among the issues to be briefed: (1) whether, in evaluating whether a distinctive group has been sufficiently underrepresented under *Duren v Missouri*, 439 US 357 (1979), so as to violate the Sixth Amendment's fair cross-section requirement, courts may choose to examine only the composition of the defendant's particular jury venire, or whether courts must always examine the composition of broader pools or arrays of prospective jurors; (2) whether a defendant's claim of such underrepresentation must always be supported by hard data, or whether statistical estimates are permissible and, if so, under what circumstances; and (3) whether any underrepresentation of African-Americans in the defendant's venire, or in Kent County jury pools between 2001 and 2002, was the result of systematic exclusion under the third prong of *Duren*. [*Id*.]

[41] See *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011).

[42] *Id*.

16

community.[43]  The United States Supreme Court recognized the fair-cross-section guarantee in *Taylor v Louisiana*.[44]  In *Taylor*, the defendant successfully challenged Louisiana's jury-selection scheme in which women would not be considered for jury service unless they filed a written declaration of their willingness to serve.[45]  For the defendant's jury district, in which 53 percent of the population was female, of the 1,800

[43] *Berghuis v Smith*, 559 US ___, ___; 130 S Ct 1382, 1384; 176 L Ed 2d 249 (2010). The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.  [US Const, Am VI.]

Although the text of the Sixth Amendment only provides in reference to a jury "the right to . . .  an impartial jury," the United States Supreme Court has ascribed to that right that the jury must be drawn from sources reflecting a fair cross section of the community in order to effectuate the purpose of a jury: "guard[ing] against the exercise of arbitrary power [by making] available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge."  *Taylor v Louisiana*, 419 US 522, 530; 95 S Ct 692; 42 L Ed 2d 690 (1975), citing *Duncan v Louisiana*, 391 US 145, 155-156; 88 S Ct 1444; 20 L Ed 2d 491 (1968).  We are cognizant that there is a reasonable argument that fair-cross-section claims should be exclusively evaluated under the Equal Protection Clause of the Fourteenth Amendment, not the Sixth Amendment, see *Berghuis*, 559 US at ___;130 S Ct at 1396 (Thomas, J., concurring), but we will not consider such an argument because we are bound by the United States Supreme Court's decisions evaluating this claim under the Sixth Amendment, see *Taylor*, 419 US at 526; see also *Duncan*, 391 US at 154-155 (incorporating the right to a jury trial in the Sixth Amendment to the states through the Due Process Clause of the Fourteenth Amendment).

[44] *Taylor*, 419 US 522.

[45] *Id*. at 523, 525.

individuals drawn to fill venires in a period of nearly a year, only 12 were female.[46]  The

Court held that Louisiana's practice systematically eliminated women, a "numerous and

distinct" group, from the jury pool, denying the defendant his right to a jury drawn from a

fair cross section of the community in violation of the Sixth Amendment.[47]

In *Duren*, the United States Supreme Court set forth a more substantive

framework designed to evaluate fair-cross-section challenges.  Specifically, to make a

prima facie case of a violation of the Sixth Amendment's fair-cross-section requirement,

a defendant must show must show:

> (1) that the group alleged to be excluded is a 'distinctive' group in
> the community; (2) that the representation of this group in venires from
> which juries are selected is not fair and reasonable in relation to the number
> of such persons in the community; and (3) that this underrepresentation is
> due to systematic exclusion of the group in the jury-selection process.[48]

The defendant in *Duren* successfully argued that the underrepresentation of

women in jury venires violated the fair-cross-section requirement.  Regarding the first

prong, there was no dispute that women were a distinct group in the community.[49]  The

defendant established the second prong "by [his] statistical presentation," showing that

while women were 54 percent of the county's population, women were only 26.7 percent

---

[46] *Id*. at 524.

[47] *Id*. at 531.  In reaching its decision, the Court emphasized that it was not imposing a requirement "that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population."  *Id*. at 538.

[48] *Duren*, 439 US at 364.

[49] *Id*.

of the persons summoned for jury service and 14.5 percent of veniremembers during an approximately nine-month period.[50]   The Court concluded that "[s]uch a gross discrepancy between the percentage of women in jury venires and the percentage of women in the community requires the conclusion that women were not fairly represented in the source from which petit juries were drawn . . . ."[51]

Regarding the third prong, the Court concluded that the underrepresentation was a result of the systematic exclusion of the group in the jury-selection process.  Specifically, the defendant's statistics, evidence that the selection scheme automatically exempted women from jury service upon their request, and evidence that a large discrepancy had occurred in every weekly venire for almost a year established "that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized."[52]

### B.  APPLICATION OF THE *DUREN* TEST

### 1.  WHETHER A DISTINCT GROUP IS ALLEGED TO HAVE BEEN EXCLUDED

There is no dispute that African-Americans, the group alleged to be excluded, are a distinct group in the community for the purposes of determining whether there is a

---

[50] *Id*. at 362, 364.

[51] *Id*. at 366.  The Court, without naming its calculation, applied the absolute-disparity test by comparing the difference between the percentage of the distinct group in the population and the percentage of the distinct group appearing in venires.

[52] *Id*.

violation of the Sixth Amendment's fair-cross-section requirement.[53]   Accordingly, defendant satisfied *Duren*'s first prong.

## 2. WHETHER REPRESENTATION IS FAIR AND REASONABLE

The second prong requires defendant to show that "representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community[.]"[54]  As we recognized in *Smith*,[55] the United States Supreme Court has not identified a method or test that courts must use to measure whether the representation of distinct groups is fair and reasonable.[56]  In light of the United States Supreme Court's decision not to mandate what method or methods should be used, and given the various tests used by lower federal courts, we concluded in *Smith* that "no individual method should be used exclusive of the others," adopting "a case-by-case approach."[57]  We further held that "[p]rovided that the parties proffer sufficient

---

[53] See, e.g., *United States v Carmichael*, 560 F3d 1270, 1280 (CA 11, 2009); *United States v Odeneal*, 517 F3d 406, 412 (CA 6, 2008); *United States v Weaver*, 267 F3d 231, 240 (CA 3, 2001).

[54] *Duren*, 439 US at 364.

[55] *Smith*, 463 Mich at 203.

[56] See *Berghuis*, 559 US at ___; 130 S Ct at 1393-1394 (acknowledging that no decision of the Court has specified the proper method or methods by which underrepresentation is appropriately measured and taking no position on the method or methods that should be used).  Additionally, the United States Supreme Court has not identified a threshold for what level of underrepresentation is not fair and reasonable. *United States v Maskeny*, 609 F2d 183, 190 (CA 5, 1980).

[57] *Smith*, 463 Mich at 204.

evidence, courts should consider the results of all the tests in determining whether representation was fair and reasonable."[58]

But in order to properly consider the results of the relevant tests, we must answer the questions we posed in our grant order to identify what data to input into the tests. Specifically, we asked the parties to brief whether in evaluating the second prong, "courts may choose to examine only the composition of the defendant's particular jury venire, or whether courts must always examine the composition of broader pools or arrays of prospective jurors" and "whether a defendant's claim of such underrepresentation must always be supported by hard data, or whether statistical estimates are permissible . . . ."[59]

We hold that when applying the relevant statistical tests, a court must examine the composition of jury pools and venires *over time* using the most reliable data available to determine whether representation is fair and reasonable. Our reading of *Duren* compels this conclusion. Specifically, *Duren* sets forth that the second prong is used to evaluate "representation of [the distinct] group in *venires* from which juries are selected . . . ."[60] The Court again used the plural "venires" when it evaluated the defendant's evidence under the second prong, pointing out the "discrepancy between the percentage of women in jury *venires* and the percentage of women in the community . . . ."[61] In addition, the

---

[58] *Id*.

[59] *Bryant III*, 489 Mich 924.

[60] *Duren*, 439 US at 364 (emphasis added).

[61] *Id*. at 366 (emphasis added). In particular, *Duren* considered the venires used for nearly a year as a part of its reasoning for concluding that the second prong was satisfied by the defendant's statistical presentation. *Id*. at 362-363, 365-366.

21

Court referred back to the requirement that the second-prong underrepresentation must occur over time when introducing its discussion on the third prong, stating, "[I]t was necessary for petitioner to show that the underrepresentation of women, *generally* and on his venire, was due to their systematic exclusion in the jury-selection process."[62] Therefore, when considering whether representation is fair and reasonable, *Duren* requires a court to evaluate the composition of *venires* over a significant time period rather than just the defendant's individual venire.[63]

---

[62] *Id*. at 366 (emphasis added).

[63] See *United States v Miller*, 771 F2d 1219, 1228 (CA 9, 1985) (stating in a discussion of *Duren*'s second prong that "[i]t appears to us that the Supreme Court's use of the plural in setting up the *Duren* test is a clear indication that a violation of the fair cross-section requirement cannot be premised upon proof of underrepresentation in a single jury"); *United States v Allen*, 160 F3d 1096, 1103 (CA 6, 1998) (stating in a discussion of *Duren*'s second prong that "[a]ppellants, however, must show more than that their particular panel was unrepresentative"); *People v De Rosans*, 27 Cal App 4th 611, 621; 32 Cal Rptr 2d 680 (1994) ("The second *Duren* prong requires a showing that the cognizable group is underrepresented in *venires* from which *juries* are selected, not on the panel from which the defendant's jury is selected."); *United States v Verdugo-Munoz*, unpublished order of the United States District Court for the District of Arizona, entered October 12, 2005 (Docket No. CR-03-1161-PHX-SRB), 2005 WL 2571608, * 2; 2005 US Dist LEXIS 23448, * 5 ("[B]ecause of the Supreme Court's use of the plural in describing the second prong of *Duren*, a defendant must proffer evidence that the underrepresentation has occurred in multiple venires."); cf. *United States v Williams*, 264 F3d 561, 568 (CA 5, 2001). In addition, an abundance of caselaw supports that when applying *Duren*'s second prong, courts look to the degree of underrepresentation over time. See, e.g., *United States v Orange*, 447 F3d 792, 798 (CA 10, 2006); *Weaver*, 267 F3d at 238, 243; *United States v Royal*, 174 F3d 1, 5, 10-11 (CA 1, 1999); *Thomas v Borg*, 159 F3d 1147, 1150 (CA 9, 1998); *United States v Rioux*, 97 F3d 648, 657-658 (CA 2, 1996); *Francis v Fabian*, 669 F Supp 2d 970, 984 (D Minn, 2009); *People v Washington*, 179 P3d 153, 162-164 (Colo, 2007); *People v Bell*, 49 Cal 3d 502, 526-527; 262 Cal Rptr 1; 778 P2d 129 (1989).

Despite our straightforward reading of *Duren* and this supporting authority, in her dissent Justice MARILYN KELLY disagrees that the second prong requires a pattern of

Consequently, the Court of Appeals wrongly considered the results of the tests from a data set that included only defendant's venire. Relying solely on the composition of defendant's venire resulted in misleading and exaggerated results.[64] The representation of African-Americans in defendant's venire is only relevant as a part of the larger picture of venires or jury pools. Because underrepresentation in a single venire could result from chance, evaluating whether representation of a distinct group is fair and reasonable requires evaluating venire composition over time. Only then is it possible to see the degree of any underrepresentation.

---

underrepresentation over time. She does so while choosing not to address the language in *Duren* that compels this treatment of the second prong. She also attempts to critique some of our supporting caselaw by ignoring that those same cases explicitly support our reading of *Duren*'s second prong. Moreover, some of the cases she cites do not even contain a substantive discussion of the second prong, while no case that she cites actually concludes that the second prong may be satisfied by a showing of underrepresentation in only a particular defendant's venire.

In addition, contrary to Justice KELLY's suggestion, our approach does not ignore defendant's venire under the second prong. Instead, we merely follow *Duren* by including it in the data set of venires used to calculate the degree of underrepresentation. See *Duren*, 439 US at 362-366 (considering under the second prong a data set that included January through March 1976, when the defendant's trial began in March 1976). Of course, as in *Duren*, 439 US at 363, the distinct group was underrepresented in defendant's individual venire, giving rise to this claim in the first place. But *Duren* reflects that such underrepresentation does not amount to a constitutional fair-cross-section violation without a showing that includes the degree of underrepresentation over time under the second prong. Thus, defendant's venire is simply part of the larger statistical presentation in this analysis.

[64] When only a particular defendant's venire is examined, the results may look more or less significant depending on the actual composition of the individual venire compared to the broader picture. But it is only by considering the broader picture that a court can evaluate whether the representation of a distinct group was fair and reasonable.

In addition, evaluating the representation of a distinct group in venires over time requires using the most reliable data available to input into the relevant tests. In this case, hard data regarding the race of those sent questionnaires or appearing for jury service are not available for two primary reasons. First, the Secretary of State did not include the racial identity of individuals in the potential-juror database that was provided to Kent County, and thus the court's computer program did not include a record of the race of the individuals who were selected. Second, the voluntary surveys that the court made available to potential jurors who appeared for jury service, which included a section in which those persons could identify their race, were plagued by wildly inconsistent participation and therefore do not provide a meaningful data set.

The circuit court did keep records of the zip code of each person sent a jury summons. Reviewing and using those records for the period from January through March 2002, Dr. Stephenson, a statistical expert, was able to estimate, using the racial makeup of each zip code from the census data, the number of African-Americans who had been summoned for jury service from January through March 2002. Given the available zip-code data and the limitations regarding the other potential data sources, it is appropriate to evaluate venire composition using Dr. Stephenson's statistical estimate.[65]

Dr. Stephenson estimated that 4.17 percent of the summonses issued were sent to African-Americans from January through March 2002. Given that the census data

---

[65] We note that Dr. Stephenson's estimate is more relevant than the results of the voluntary survey in determining whether the body of potential African-American jurors as a whole was underrepresented because it actually looked at who was chosen to receive summonses rather than who decided to appear for service on a given day.

reflects that the jury-age population of African-Americans in the community is 8.25 percent, it is clear that African-Americans were underrepresented. The pertinent question then is whether this underrepresentation in the composition of jury pools and venires during this time was nonetheless fair and reasonable.

### a. ABSOLUTE-DISPARITY TEST

The absolute-disparity test is the most widely applied test and is used by the majority of jurisdictions to evaluate whether the representation of a distinct group was fair and reasonable.[66] This test measures a group's underrepresentation by subtracting the percentile representation of that group in jury pools or venires from the percentile representation of that group in the overall population of the relevant community.[67] The absolute-disparity test is useful because it permits a straightforward and undistorted measure of the percentage of the group that has been excluded.[68] Courts have generally required an absolute disparity of more than 10 percent to indicate that the representation of the distinct group was not fair and reasonable.[69]

---

[66] See *Delgado v Dennehy*, 503 F Supp 2d 411, 425-426 (D Mass, 2007) (collecting cases).

[67] See *Royal*, 174 F3d at 6-7, 10.

[68] See *id*. at 7; see also Note, *Re-justifying the fair cross section requirement: Equal representation and enfranchisement in the American criminal jury*, 116 Yale L J 1568, 1596 (2007).

[69] See *United States v Ashley*, 54 F3d 311, 313-314 (CA 7, 1995); *Maskeny*, 609 F2d at 190. Although the United States Supreme Court has not endorsed the absolute-disparity test, it performed the same calculation to evaluate the disparity in *Duren*. *Duren*, 439 US at 364-366; see also *People v Burgener*, 29 Cal 4th 833, 860; 129 Cal Rptr 2d 747; 62 P3d 1 (2003).

The absolute-disparity test, however, is often criticized because it makes it difficult, if not impossible, for a defendant to make this showing if the distinct group has a small population in the community.[70] For example, even if the 8.25 percent African-American population here had been entirely excluded from jury pools and venires for the three-month period analyzed, the absolute disparity would have been only 8.25 percent, falling below the threshold generally applied to determine whether the representation is fair and reasonable.[71]

Given that the Kent County African-American jury-age population figure is 8.25 percent and the percentage of African-Americans sent jury summonses from January through March 2002 was 4.17 percent, the absolute disparity is 4.08 percent.[72] The Court of Appeals, however, disregarded the result of this test because the African-American

---

[70] *Smith*, 463 Mich at 203-204. One commentator elaborated on a problem with the absolute-disparity test as follows:

> If the jurisdiction is 99% African American and venires are 49% African American, then defendants would be virtually assured of having African Americans on their petit juries, despite the 50% absolute disparity. If, on the other hand, the overall population is 50% African American and venires are 0% African American, then the odds of having an African American petit juror would drop from near-certainty to total impossibility. The fact that the absolute disparity test cannot distinguish between these radically different scenarios indicates that it does not measure defendants' probabilistic injuries. [Commentary, *Jury poker: A statistical analysis of the fair cross-section requirement*, 8 Ohio St J Crim L 533, 545 (2011).]

[71] See, e.g., *Thomas*, 159 F3d at 1151 (addressing an absolute disparity of approximately 5 percent); *United States v Suttiswad*, 696 F2d 645, 649 (CA 9, 1982) (addressing absolute disparities of 2.8 percent, 7.7 percent, and 4.7 percent); *United States v Clifford*, 640 F2d 150, 155 (CA 8, 1981) (addressing an absolute disparity of 7.2 percent).

[72] 8.25 percent minus 4.17 percent is 4.08 percent.

population is small. Although the African-American population in Kent County falls below 10 percent, *Smith* nonetheless requires "consider[ation] [of] the results of all the tests in determining whether representation was fair and reasonable" and instructs that "no individual method should be used exclusive of the others."[73] Thus, even when the African-American population is small, *Smith* does not allow a court to simply ignore the absolute-disparity test entirely. Rather, a reviewing court should look at the *results* of each test and how far each test is below or above the necessary threshold in determining whether, on the whole, the defendant has established that the representation was not fair and reasonable. Consequently, despite the criticism of the absolute-disparity test, the Court of Appeals should not have disregarded the test's results.

### b. COMPARATIVE-DISPARITY TEST

Some courts have used the comparative-disparity test, which measures "the decreased likelihood that members of an underrepresented group will be called for jury service . . . ."[74] It is calculated by dividing the result of the absolute-disparity test by the percentage of the distinct group in the overall population of the community.[75] The comparative-disparity test is not widely used and is criticized because it invites distortion

---

[73] *Smith*, 463 Mich at 204.

[74] *United States v Shinault*, 147 F3d 1266, 1272 (CA 10, 1998) (emphasis omitted).

[75] *Id.* Unlike the absolute-disparity test, the United States Supreme Court has never applied the comparative-disparity test in practice.

of the alleged underrepresentation, particularly when the population of the distinct group is small.[76]

The Court of Appeals, after disfavoring the result of the absolute-disparity test because the percentage of the distinct group in the relevant community was low, effectively established a bright-line rule favoring the comparative-disparity test when the population of the distinct group is small. This holding directly contradicts the case-by-

---

[76] *Smith*, 463 Mich at 204; see also *Thomas*, 159 F3d at 1150 (disfavoring the comparative-disparity test because "it exaggerates the effect of any deviation"); accord *Royal*, 174 F3d at 8-9. For example, assuming that the population of the distinct group was one and that person was excluded, the result of the comparative disparity is 100 percent even though a jury without that member "would clearly form a 'fair cross section' of the community." *United States v Hafen*, 726 F2d 21, 24 (CA 1, 1984). As one commentator put it, "[a] test that finds maximal underrepresentation in a situation in which the defendant's chances of jury composition are virtually unaffected cannot be a good one to apply generally." Note, *A proposal for measuring underrepresentation in the composition of the jury wheel*, 103 Yale L J 1913, 1928 (1994). Another commentator described the problem with the comparative-disparity test as follows:

> Yet the comparative disparity test lacks the absolute disparity test's awareness of what fraction of the total [population] has been tampered with. For example, when all African Americans are absent from venires, the result is the highest possible comparative disparity score, 100%. But that figure is useless unless one also accounts for how many African Americans are in the overall population. If the total population is majority African American, then the observed underrepresentation would reduce the odds of drawing an African American juryperson from near certainty to total impossibility. If, on the other hand, African Americans comprise just 0.1% of the total population, then the likelihood of drawing an African American would not have significantly declined. Thus, despite its support among prominent commentators, the comparative disparity test, like the absolute disparity test, simply does not measure the probabilistic injuries generated by fair cross-section violations. [*Jury Poker*, 8 Ohio St J Crim L at 545-546.]

case approach set forth in *Smith*.[77] Again, the comparative-disparity test is particularly defective when the claim involves a small population of a distinct group because it distorts the extent of any underrepresentation. Thus, it does not follow to elevate the comparative-disparity test while disregarding the others tests in precisely the circumstance that the comparative-disparity test is most criticized and apt to produce distorted results.

The Court of Appeals further erred when it considered the 73.1 percent result of the comparative-disparity test for only defendant's venire. Using the proper data from Dr. Stephenson's three-month examination of venires, the comparative-disparity was 49.45 percent.[78] The United States Courts of Appeal for the First, Third, Ninth, and Tenth Circuits have each found permissible comparative disparities above 50 percent.[79]

---

[77] *Smith*, 463 Mich at 204. Justice MARILYN KELLY claims that we have mischaracterized the Court of Appeals' opinion regarding the establishment of a bright-line rule in favor of the comparative-disparity test when the population of the distinct group is small. The Court of Appeals' opinion belies this claim. In particular, the panel, after a discussion of the absolute-disparity test and the comparative-disparity test stated, "We must apply some test to measure the representation of African-Americans in defendant's venire . . . ." *Bryant II*, 289 Mich App at 270. It continued, "[T]he comparative-disparity test is most appropriate to measure underrepresentation in cases in which the percentage of African-Americans in the relevant community is low." *Id*. Thus, contrary to Justice KELLY's dissent, the Court of Appeals ultimately used *only* the result from the comparative-disparity test to evaluate defendant's claim under the second prong. This approach is clearly contrary to *Smith*, 463 Mich at 204, which requires that "no individual method should be used exclusive of the others." By ultimately using the comparative-disparity test and no other, the Court of Appeals did just the opposite of what *Smith* requires.

[78] The absolute-disparity result of 4.08 percent divided by the 8.25 percent African-American population figure yields a result of 49.45 percent.

[79] See *Orange*, 447 F3d at 798-799 (noting that the court had upheld selection procedures involving comparative disparities between 38.17 percent and 51.22 percent); *United*

29

Moreover, the cases cited by the Court of Appeals for the proposition that 30 or 40 percent has been deemed sufficient to demonstrate unfair and unreasonable representation are readily distinguishable.

In *United States v Rogers*, a 30.96 percent comparative disparity was deemed significant by an Eighth Circuit panel, but this determination was made in dicta as the panel was bound by earlier Eighth Circuit precedent regarding the particular jury system under review.[80] Accordingly, the panel had to affirm the defendant's convictions.[81] Thus, given that the Eighth Circuit has not adopted the comparative-disparity test or found it determinative in any case, we do not afford *Rogers* any weight and view it as an outlier in fair-cross-section jurisprudence. Additionally, in *Ramseur v Beyer*, which the Court of Appeals also cited, a 40 percent comparative disparity was deemed "borderline."[82] The minority population in that case was 35.9 percent, and the absolute disparity was 14.1 percent. Thus, the minority population was far larger than in the case at hand. A 40 percent comparative disparity is not a persuasive baseline for this case because the comparative-disparity test distorts the results in cases involving small

---

States v Sanchez-Lopez*, 879 F2d 541, 547-549 (CA 9, 1989) (concerning a comparative disparity of 52.9 percent); *Hafen*, 726 F2d at 23 (concerning a comparative disparity of 54.2 percent); *Shinault*, 147 F3d at 1273 (concerning comparative disparities between 48.63 percent and 59.84 percent); *Royal*, 174 F3d at 10 n 10 (concerning a comparative disparity of 60.9 percent); *Weaver*, 267 F3d at 243 (concerning comparative disparities between 40.01 percent and 72.98 percent).

[80] *United States v Rogers*, 73 F3d 774, 775-777 (CA 8, 1996).

[81] *Id*. at 775.

[82] *Ramseur v Beyer*, 983 F2d 1215, 1232 (CA 3, 1992).

populations.[83]    Given that the comparative-disparity test distorts the results when the population of the distinct group is small and because the result here falls below the level of disparity that has generally been deemed acceptable by other courts, we conclude that defendant has failed to establish that African-American representation was not fair and reasonable under the comparative-disparity test.

### c. STANDARD-DEVIATION TEST

The standard-deviation test, also known as the statistical-significance test, calculates the probability that the observed underrepresentation of the distinct group was the result of chance.[84]    The standard-deviation test compares the actual distribution of the distinct group within the data set to the proportional distribution, measuring the "extent to which an observed result is likely to vary from an expected result.  The larger the number of standard deviations an observed result is from an expected result, the lower the probability that the observed result is random."[85]    The use of this test has its roots in United States Supreme Court caselaw considering juror representation in the equal-protection context.[86]    However, "'no court in the country has accepted [a standard-

---

[83] See *Weaver*, 267 F3d at 243 (distinguishing *Ramseur* for the same reason).

[84] See *Jury Poker*, 8 Ohio St J Crim L at 549-550.

[85] *Jefferson v Morgan*, 962 F2d 1185, 1189 (CA 6, 1992).

[86] See *Castaneda v Partida*, 430 US 482, 496 n 17; 97 S Ct 1272; 51 L Ed 2d 498 (1977) ("As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist.").

deviation analysis] alone as determinative in Sixth Amendment challenges to jury selection systems.'"[87]

It is unsurprising that no court has ever accepted the result of this test alone as determinative in this type of challenge because the test in effect has nothing to do with the evaluation of the second prong. That is, whether the degree of underrepresentation is statistically significant and not the result of chance does not inform whether the level of representation is fair and reasonable.[88] Instead, such a result is more appropriately considered in the equal-protection context as an aid in determining whether intentional discrimination exists or perhaps as a part of the evaluation of the third *Duren* prong.[89] This reality is simply a function of what the test *actually measures*—the randomness of a given disparity, not the extent of the disparity.[90]

Further, Dr. Stephenson concluded that it was inappropriate to apply the standard-deviation test in this case because the normal approximation was not valid. He did,

---

[87] *Smith*, 463 Mich at 204, quoting *Rioux*, 97 F3d at 655 (alteration in original).

[88] As one commentator stated:

> [T]he question answered by [the standard-deviation test], while an interesting one, is not the appropriate one for a fair cross-section analysis. The probability that the composition of a jury wheel arose by random selection from the community is not directly related to the defendant's chances of drawing a jury of a certain composition. [*Measuring underrepresentation*, 103 Yale L J at 1928.]

[89] See *Jefferson*, 962 F2d at 1189 (setting forth that "in the context of racial discrimination claims, the larger the number of standard deviations, the more likely the observed result is the product of discrimination rather than chance").

[90] See *Jury Poker*, 8 Ohio St J Crim L at 550.

however, apply a related test to determine that the extent of underrepresentation from January through March 2002 was not the result of random chance. Nonetheless, all we garner from the result is just that—the underrepresentation was not a random occurrence. The mere fact that the underrepresentation was not the result of random chance does not establish that it was not fair and reasonable. Thus, we afford the result of this test no weight.[91]

### d. DISPARITY-OF-RISK TEST

Another test that is sometimes discussed is the disparity-of-risk test.[92] This test measures "the likelihood that the difference between a group's representation in the jury pool and its population in the community will result in a significant risk that the jury will not fairly represent the group."[93] It does so by comparing the chance that a defendant's jury (before or without voir dire)[94] will include members of a distinct group if that

---

[91] Justice MARILYN KELLY's dissent views this treatment of the standard-deviation test as inconsistent with our criticism of the Court of Appeals. Yet she does not contest that the standard-deviation test has nothing to do with measuring whether the representation is fair and reasonable. Thus, it is not that the standard-deviation test merely has flaws like the other tests; it is that it is irrelevant to the consideration of the second prong. Therefore, unlike the other tests, it cannot logically inform our evaluation.

[92] Although occasionally discussed, it appears that no court has applied it.

[93] *Commonwealth v Arriaga*, 438 Mass 556, 566-567; 781 NE2d 1253 (2003); see *Measuring underrepresentation*, 103 Yale L J 1913 (proposing the use of the disparity-of-risk test).

[94] The analysis focuses on the effects of the jury-selection system, not the effects of peremptory or for-cause strikes because the effects of these strikes on a defendant's jury are resolved under an equal-protection analysis. See *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986). The strategic decisions in voir dire shed no light on whether representation in venires is fair and reasonable at the outset. Thus, this analysis

33

group's representation in the jury pool is consistent with its population in the community with the chance that a defendant's jury will include members of the same group given the particular underrepresentation alleged.[95]

considers the probability of drawing a given number from a distinct group when randomly drawing 12 potential jurors at a time.

[95] See *Jury Poker*, 8 Ohio St J Crim L at 537 n 25.  This test employs the binomial theorem to obtain the necessary probabilities for comparison.  The binomial theorem in this situation expresses as a percentage the difference between what would be the expected normal distribution of a distinct group in 12-person juries assuming that representation in the jury pool is the same as in the community and the actual distribution of a group in 12-person juries assuming that the distinct group is underrepresented in the jury pool.  The following results were computed using a binomial calculator available at Texas A&M University Department of Statistics <http://www.stat.tamu.edu/~west/ applets/binomialdemo.html> (accessed June 26, 2012), with "n" representing the number of jurors drawn, "p" representing the probability of success in choosing a juror from the distinct group in one drawing, "x" representing the possible number of jurors from that group on the jury, and "Prob (x)" representing the probability of that number resulting. The results show the probabilities for an expected  number of members of the distinct group in a 12-person jury if the drawing were fully representative (p = 0.0825) and the probabilities for an expected  number of members of the distinct group in a 12-person jury given the known degree of underrepresentation in this case (p = 0.0417):

| x | Prob (x) When p = 0.0825 and n = 12 | Prob (x) When p = 0.0417 and n = 12 |
|---|---|---|
| 0 | 0.3559 | 0.5998 |
| 1 | 0.3840 | 0.3132 |
| 2 | 0.1899 | 0.0750 |
| 3 | 0.0569 | 0.0109 |
| 4 | 0.0115 | 0.0011 |
| 5 | 0.0017 | 0.00007 |
| 6 | 0.00002 | 0.00000 |
| 7 | 0.00001 | 0.00000 |
| 8 | 0.00000 | 0.00000 |
| 9 | 0.00000 | 0.00000 |
| 10 | 0.00000 | 0.00000 |
| 11 | 0.00000 | 0.00000 |

Although this test is not new, the primary reason for its disfavor is because it has yet to garner approval from any court.[96] But given the absence of uniformity for what tests to apply, we will consider it among other measures of underrepresentation. Its purpose—to estimate the probability of actual underrepresentation on a jury—is consistent with the United States Supreme Court's aims to protect *a defendant's right* to an impartial jury and a fair trial by means of a jury drawn from a fair cross section of the community.[97] Moreover, considering this test is consistent with *Smith*'s holding that "[p]rovided that the parties proffer sufficient evidence, courts should consider the results of all the tests in determining whether representation was fair and reasonable."[98] Thus, it is relevant to consider the extent to which a defendant's chances of a representative jury were altered by underrepresentation in the jury pool by measuring the diminished likelihood that a randomly drawn 12-person jury includes a given number from a distinct

---

To take an example from these results, a 12-person jury drawn from a pool proportionate to the actual population of African-Americans in Kent County (8.25 percent) would be expected to have one African-American 38.4 percent of the time, while a 12-person jury drawn from a pool containing 4.17 percent African-Americans would be expected to have one African-American 31.32 percent of the time. For a more detailed mathematical description of the binomial theorem see *Jury Poker*, 8 Ohio St J Crim L at 537 n 25.

[96] See *Arriaga*, 438 Mass at 566; *United States v Green*, 389 F Supp 2d 29, 54 (D Mass, 2005), overruled on other grounds by *In re United States*, 426 F3d 1 (CA 1, 2005); *Delgado*, 503 F Supp 2d at 425 (D Mass, 2007).

[97] See *Williams v Florida*, 399 US 78, 100; 90 S Ct 1893; 26 L Ed 2d 446 (1970) (stating that juries must be selected so as "to provide a fair possibility for obtaining a representative cross-section of the community").

[98] *Smith*, 463 Mich at 204. The necessary evidence is available in the record to calculate the risk disparity in this case.

group.[99]  In this case, when considering the likelihood that a defendant's 12-person jury would contain no African-Americans the disparity of risk was 24.39 percent.[100]

Unlike the absolute-disparity test and the comparative-disparity test, courts have not considered the appropriate threshold under which the disparity of risk should be deemed fair and reasonable. We believe the normative line should be drawn at 50 percent.[101]  That is, disparities of risk that exceed 50 percent should be deemed unfair and unreasonable. This is a logical normative line because when measuring a defendant's probabilistic injuries, a risk disparity of 50 percent or lower shows that, more likely than not, removing the underrepresentation would not have altered the composition of a

_____

[99] See *Re-Justifying the fair cross section requirement*, 116 Yale L J at 1597 (stating that underrepresentation of what already is a small group does not "appreciably impact the defendant's 'fair possibility' of a representative jury").

[100] We consider the disparity between the ideal risk and the actual risk for having no African-Americans on a randomly selected 12-person jury because it is the largest disparity. Thus, it represents where the underrepresentation most affected the expectations of a particular result. See *Jury Poker*, 8 Ohio St J Crim L at 540 n 28.

In any randomly drawn 12-person jury drawn from a pool exactly proportionate to Kent County's African-American population as a whole (8.25 percent), a defendant can expect no African-Americans on the jury 35.59 percent of the time. This is called the "ideal risk" because it measures the probability of a particular result without underrepresentation. However, when randomly drawing from the disproportionate jury pool that occurred in this case (4.17 percent African-American), the probability of a 12-person jury containing no African-Americans rises to 59.98 percent. This is called the "actual risk" because it measures the probability of a particular result given the actual underrepresentation. With a 4.17 percent representation rate, a defendant would expect to have no African-Americans on a 12-person jury 59.98 percent of the time. The disparity-of-risk test, thus, calculates the difference between the ideal risk (35.39 percent) and the actual risk (59.98 percent), resulting in a disparity of risk of 24.39 percent.

[101] See *id*. at 541-542 (proposing a 50 percent threshold).

defendant's jury.[102] Consequently, defendant has failed to show that the representation of African-Americans was not fair and reasonable under the disparity-of-risk test.[103]

Given the results of the foregoing tests, defendant has failed to show that the representation of African-Americans in the venires at issue was not fair and reasonable. Instead, the results of the absolute-disparity test, comparative-disparity test, and disparity-of-risk test all support the opposite conclusion: that the representation of African-Americans was fair and reasonable. Accordingly, we conclude that defendant did not make out a prima facie case for his Sixth Amendment fair-cross-section claims. Notwithstanding our conclusion on this determinative issue, we will address the third prong in order to consider the argument that a defendant who shows systematic exclusion under the third prong is entitled to make a lesser showing under the second prong.

### 3. WHETHER UNDERREPRESENTATION RESULTS FROM SYSTEMATIC EXCLUSION

The third *Duren* prong requires a defendant to show that "this underrepresentation is due to systematic exclusion of the group in the jury-selection process."[104] A systematic

---

[102] See *id*. (stating that such a line "parallel[s] the commonplace legal rule that claimants are entitled to no relief when they fail to show it is more likely than not that they have been wronged"). We also note that defendant's risk disparity of roughly 24 percent even falls below the 37 percent threshold proposed by the author who first introduced this test. *Measuring underrepresentation*, 103 Yale L J at 1936-1937. We do not adopt the 37 percent threshold because there is no normative rationale for doing so.

[103] Although the dissenting Justices question our use of the disparity-of-risk test, they notably make no substantive critique of the test itself.

[104] *Duren*, 439 US at 364.

exclusion is one that is "inherent in the particular jury-selection process utilized."[105]  In *Duren*, the United States Supreme Court concluded that the practice of excluding women in every weekly venire for nearly a year constituted underrepresentation that was systematic.[106]

The evidence here shows that a computer programming error in the computer software used to randomly select potential jurors from the Secretary of State database of names of eligible jurors in Kent County truncated that database of names from 453,414 eligible jurors to 118,169.  The smaller list of names was used to randomly select potential jurors.  This list, however, disproportionately included more individuals in certain zip codes and fewer from other zip codes.  The underrepresented zip codes on the whole had higher concentrations of African-Americans.  Thus, the computer program error, which was the cause of the systematic exclusion, was one that was "inherent" in the computer program, which was "the particular jury-selection process utilized" to select potential jurors for service.

It is irrelevant for the purpose of this analysis that the computer error was not intentional and was corrected upon its discovery because under the third prong "systematic disproportion *itself* demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section."[107]  Thus, the fact that the computer error was unintentional, and that it was fixed upon its discovery, is immaterial to whether

---

[105] *Id*. at 366.

[106] *Id*. at 359, 366.

[107] *Id*. at 368 n 26 (emphasis added).

systematic exclusion was occurring at the time defendant's jury was selected. Accordingly, we conclude that defendant satisfied the third prong by showing that the exclusion was systematic.[108]

In *Hubbard*, a panel of our Court of Appeals addressed a fair-cross-section claim and held that the threshold for underrepresentation is lower when the underrepresentation is "the result of circumstances less benign than random selection . . . ."[109] In that case, "[t]he evidence produced on remand reveal[ed] that the juror allocation process employed by Kalamazoo County before July 1992—and not random selection—caused the underrepresentation."[110] The panel concluded that "given the lack of benign causation, . . . the level of disparity [absolute disparity of 3.4 percent to 4.1 percent] constituted substantial underrepresentation under the Sixth Amendment."[111]

In lowering the threshold of the second prong in circumstances in which the level of disparity was the result of nonbenign circumstances, the *Hubbard* panel erroneously

---

[108] Because defendant presented direct evidence of a systematic exclusion, we need not address whether statistics alone may establish that underrepresentation was the result of a systematic exclusion inherent in the jury-selection process.

[109] *Hubbard*, 217 Mich App at 480. The minority population in *Hubbard* was 7.4 percent. The panel considered only the absolute-disparity test, but found the test flawed, relying largely on *United States v Osorio*, 801 F Supp 966, 978-979 (D Conn, 1992), for its holding that such a level of disparity resulting from nonbenign circumstances satisfied the second *Duren* prong.

[110] *Hubbard*, 217 Mich App at 480.

[111] *Id*. at 481. Although not addressed by the panel in *Hubbard*, given that the minority population in *Hubbard* was 7.4 percent, the comparative disparity ranged from 44.6 percent to 55.4 percent.

assumed that the underrepresentation contemplated by the second *Duren* prong depends in part on the reason for the underrepresentation. The reason for the underrepresentation is the basis of the third prong, and the only issue in the second prong is whether the degree of underrepresentation is acceptable. In other words, *Duren* requires satisfaction of *three* distinct prongs. An approach that arbitrarily gives a defendant the benefit of the doubt on the second prong vitiates the three-part analysis. Even if a defendant can show underrepresentation that was systematic, a defendant must show that the extent of any underrepresentation was not fair and reasonable. Moreover, it would be inconsistent to conclude that a certain level of underrepresentation that would otherwise be fair and reasonable absent systematic exclusion is suddenly not fair and reasonable because the cause of the underrepresentation is nonbenign.

Additionally, *Hubbard*'s rationale for adopting the approach set forth in *United States v Osorio*[112] is belied by our case-by-case approach. Specifically, *Hubbard* articulated concerns about applying the absolute-disparity test in a situation in which the minority population was relatively small. *Smith*, however, instructs courts not to limit the statistical tests to be considered.[113] Thus, the justification for turning to *Osorio* is diminished by our case-by-case approach evaluating all the relevant tests. As a result, because the *Hubbard* approach improperly conflates the second and third prongs as set forth in *Duren* and because its rationale is unnecessary in light of our case-by-case

---

[112] *Osorio*, 801 F Supp 966.

[113] In *Smith*, we disapproved the concurring opinion's endorsement of *Hubbard*, but declined to reach the issue because it was unnecessary to resolve the case. *Smith*, 463 Mich at 205 n 1.

approach, we reject it and overrule *Hubbard* to the extent that it is inconsistent with this opinion.

## IV. CONCLUSION

This case presented the issue whether defendant was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community. Because we conclude that defendant did not establish that the representation of African-Americans was not fair and reasonable under second prong of the *Duren* test, we reverse the judgment of the Court of Appeals and reinstate defendant's convictions and sentences.

Brian K. Zahra
Robert P. Young, Jr.
Stephen J. Markman
Mary Beth Kelly

41

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellant,

v                                No. 141741

RAMON LEE BRYANT,

       Defendant-Appellee.

_____

MARKMAN, J. (*concurring*).

I join in the majority opinion, which reasonably applies the test governing the Sixth Amendment's "fair cross section" requirement, as articulated by the United States Supreme Court in *Duren v Missouri*, 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979). I write separately only because I have questions concerning both *Duren*'s test and the constitutional standard toward which this test is directed.

The Sixth Amendment guarantees criminal defendants the right to a trial "by an impartial jury . . . ." In *Taylor v Louisiana*, 419 US 522, 526; 95 S Ct 692; 42 L Ed 2d 690 (1975), the Supreme Court determined that "the presence of a fair cross section of the community on venires, panels, or lists from which petit juries are drawn is essential to the fulfillment" of this constitutional guarantee. The "fair cross section" requirement is satisfied as long as "distinctive" groups are reasonably represented on the jury venire; however, it does not entitle a defendant to a jury whose composition is proportional to

that group's presence within the community from which the venire is chosen. As *Taylor* emphasized:

> Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof. [*Id*. at 538 (citations omitted).]

Under the "fair cross section" analysis, it is unnecessary for a defendant to show that the lack of "reasonable representation" of a "distinctive" group is the result of discrimination in the jury-selection system, as would be required under the Equal Protection Clause of the Fourteenth Amendment. See, e.g., *Castaneda v Partida*, 430 US 482, 494; 97 S Ct 1272; 51 L Ed 2d 498 (1977). Rather, in "fair-cross-section cases, systematic disproportion *itself* demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section." *Duren*, 439 US at 368 n 26 (emphasis added). So the critical constitutional inquiry appears to be directed toward the extent or magnitude of the "systematic disproportion." While "proportional" representation of "distinctive" groups is not required, what constitutes "proportional" representation must nonetheless be constantly borne in mind so that the level of "disproportion" can be calculated because, at some uncertain point, a level of "disproportion" that is apparently constitutionally *acceptable* is transformed into a level of "disproportion" that *breaches* the Sixth Amendment. And it is the responsibility of this Court to determine on a "case by case" basis when that point of transformation occurs, principally through the application of myriad statistical tests, some of which have been given the explicit imprimatur of the United States Supreme Court and others of

2

which have not, but at the same time have not been repudiated, in light of the apparent nonexclusivity of the approved tests.

In *Duren*, the Supreme Court set forth a three-part test to evaluate "fair cross section" challenges. Specifically, in order to establish a prima facie case, a defendant must show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. [*Id.* at 364.]

The dispositive question in this case concerns the second part of *Duren*'s test-- i.e., whether the representation of African-Americans in venires from which juries were selected in Kent County during the period in which defendant was tried and convicted is "fair and reasonable in relation to the number of such persons in the community." *Id.*

To determine whether representation is "fair and reasonable" under the *Duren* test, courts have applied yet *more* tests. In *People v Smith*, 463 Mich 199; 615 NW2d 1 (2000), this Court discussed three statistical tests that have been used to measure whether representation of a "distinctive" group in the jury pool is "fair and reasonable": the "absolute disparity" test, the "comparative disparity" test, and the "standard deviation" test. Recognizing that all three tests are imperfect and susceptible to criticisms, *Smith* held:

> We thus consider all these approaches to measuring whether representation was fair and reasonable, and conclude that no individual method should be used exclusive of the others. Accordingly, we adopt a case-by-case approach. Provided that the

3

> parties proffer sufficient evidence, courts should consider the results of all the tests in determining whether representation was fair and reasonable. [*Id.* at 204.]

After a decision on habeas corpus review by the United States Court of Appeals for the Sixth Circuit asserting that *Smith* constituted an "unreasonable" application of "clearly established federal law," *Smith v Berghuis*, 543 F3d 326, 329, 334 (CA 6, 2008), the United States Supreme Court unanimously reversed the Sixth Circuit, holding that "neither *Duren* nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools." *Berghuis v Smith*, 559 US ___, ___; 130 S Ct 1382, 1393; 176 L Ed 2d 249 (2010). Noting that "[e]ach test is imperfect," the Supreme Court declined "to take sides today on the method or methods by which underrepresentation is appropriately measured." *Id.* at ___; 130 S Ct at 1393-1394.

Given this state of the law, I join the majority opinion because it engages in a reasoned application of the relevant decisions of the United States Supreme Court and this Court. Consistently with the approach outlined in our decision in *Smith*, the majority opinion considers the results of all three tests for which the parties have proffered evidence in determining whether the representation of African-Americans, the "distinctive" group in question, was "fair and reasonable" in Kent County venires. Specifically, the majority opinion considers the results of the "absolute disparity" and the "comparative disparity" tests, as well as those of an additional test, the "disparity of risk"

4

test,[1] and concludes that the results are insufficient to warrant a finding that African-American representation in the venires during the relevant period was not "fair and reasonable." Thus, defendant has failed to establish a prima facie violation of the Sixth Amendment's "fair cross section" requirement. Although the Court of Appeals' opinion and the dissenting opinions of this Court also, in my judgment, reflect reasonable efforts to apply *Duren*, their use of only the results from the "comparative disparity" test to ascertain a "fair cross section" violation, their decisions not to use data from multiple venires over time, and their decisions not to fully consider the results of the "absolute disparity" test cause me to prefer the majority's analysis. See *Smith*, 463 Mich at 204 ("[N]o individual method should be used exclusive of the others.").

That said, the fact that both sides have sought reasonably and in good faith to apply *Duren* underscores questions concerning *Duren*'s test itself. These largely arise from the sense that in applying *Duren*, this Court seems to me engaged more in the judicial equivalent of a Rorschach test, an essentially standardless inquiry in which judicial conclusions are indicative more of personal judgments concerning the "fairness and reasonableness" of the Kent County venire than in the application of any discernible constitutional command.

In particular, I am concerned about the statistical tests used to determine whether *Duren*'s second part has been satisfied. The limitations of these tests have been widely

---

[1] The majority opinion does not analyze the results of the "standard deviation" test because the only expert whom the trial court found credible, Dr. Paul Stephenson, testified that the test was "not appropriate" in the present circumstances.

noted, see, e.g., *Berghuis*, 559 US at ___; 130 S Ct at 1393; *ante* at 25-37; *post* at 5-7, and need not be revisited here. It suffices to say that when, as here, members of the "distinctive" group comprise only a relatively small percentage of the community's jury-eligible population, one test arguably makes it difficult for a defendant to ever satisfy the requisite showing of "underrepresentation," another arguably exaggerates this "underrepresentation," and the third appears to be generally disfavored because it does not constitute an appropriate measure of anything obviously relevant to a determination whether the level of representation on the venires was "fair and reasonable." In light of these deficiencies, how do the results of these tests, either considered individually or collectively, usefully illuminate whether representation was "fair and reasonable"? How do the bench and bar draw a meaningful legal conclusion from the application of these tests to the available statistical data? How rational, and how flexible, are the statistical thresholds that have been established by some courts in distinguishing between "underrepresentations" that are compatible with a "fair cross section," and those that are not? To what extent, if any, may these thresholds be raised or lowered, as a function of the nature or the degree of any "systematic exclusion" under the third part of *Duren*, or must these parts be analyzed entirely discretely? To what extent, if any, should these thresholds be raised or lowered by Fourteenth Amendment considerations of discriminatory purpose or intention, or are those considerations simply irrelevant to the "fair and reasonable" analysis under the Sixth Amendment? To what extent are these thresholds emblematic of what the dissent in *Duren* predicted would become a mere "constitutional numbers game," *Duren*, 439 US at 375 (Rehnquist, J., dissenting), or do

these effectively communicate some independent reality as to what is required by the Constitution? Existing statistical tests and thresholds certainly provide one means by which to address *Duren*'s second part, but is it now the law of the land that the fate of criminal defendants, such as Ramon Bryant, as well as the effectiveness of the criminal justice system in communities, such as Kent County, in maintaining the security of their citizens are to be determined as a function of whether the data emerging from a host of statistical tests are to be "rounded up" or "rounded down," the number of decimal points considered, and whether the denominator reflecting the presence of the "distinctive" group within the community has been determined by the most recent census figures, by mid-census estimates, or by the latest moving-van rental figures? In summary, which specific statistical tests best communicate whether jury representation of "distinctive" groups is constitutionally "fair and reasonable," and under what circumstances, and by the application of which thresholds of deviation from the "proportional" representation standard? If the fate of individual defendants, and the ability of individual communities to carry out the enormous responsibility of protecting their citizens from criminal predators, is to be dependent on statistical testing, then there should be no uncertainty regarding either the relevance of a particular test in a particular circumstance or the standards for assessing, and thereby according legal and constitutional significance to, the results of those tests.

However, perhaps an even more fundamental question is also raised here-- why certain statistical tests and not others? The United States Supreme Court has acknowledged that the three tests described in *Smith* are each imperfect, *Berghuis*, 559

US at ___; 130 S Ct at 1393, and has declined "to take sides today on the method or methods by which underrepresentation is appropriately measured," *id.* at ___; 130 S Ct at 1393-1394. Doubtless, there is no end to statistical tests by which a court might seek to compare various-sized populations of "distinctive" groups within a community and their representation on venires. Equally doubtless, as evidenced in this very case, tests can be devised that will tend both toward sustaining and repudiating a finding of "underrepresentation." Is the new "disparity of risk" test a genuinely valid means of adducing the existence of a Sixth Amendment violation, or are the dissenting justices correct that it "neither improves nor clarifies this area of the law"? *Post* at 1. What are the *standards* by which this Court can discern which tests are relevant in identifying Sixth Amendment violations? And what is the relevance of the fact that some tests might point in one direction regarding the second *Duren* part, and others might point in the opposite direction? Does this suggest that these tests are asking and answering different questions, or that one test is asking and answering the wrong question? How do judges *test* the tests to ensure that the right question is being asked? When tests differ in their results, how are these results to be reconciled in answering the ultimate constitutional question? May the court compare and contrast the degree or extent to which different tests deviate from thresholds distinguishing acceptable and unacceptable levels of statistical disparity? Is the court simply free to choose at its discretion among such conflicting tests? If there is some actual decision-making *standard* in selecting among conflicting tests, what is it? If such a standard has anything to do with determining which test better identifies "fair and reasonable" representation of "distinctive" groups in

venires, then is this not a Catch-22 tautology, to wit, in choosing among tests that best identify the absence of "fair and reasonable" representation, a court must employ the test that best identifies "fair and reasonable" representation? What if multiple tests are applied, as in the instant case, and these produce split results of 2-1 or 3-1 or 7-6 in favor of the plaintiff or the defendant? Is there some "majority rule" that requires that we resolve conflicts in favor of the outcome of the majority of statistical tests applied? If so, does this not render all-important the court's initial determination of which tests are going to be considered, and how that is to be determined? And if the "majority rule" does not apply, how do courts *distinguish* among conflicting tests in determining which of these will be dispositive in concluding that the Sixth Amendment has or has not been breached?[2]

These and related questions concern the meaning of *Smith*'s directive that courts must "*consider* all . . . approaches to measuring whether representation was fair and reasonable . . . ." *Smith*, 463 Mich at 204 (emphasis added). Indeed, very different conceptions of this obligation are reflected in the majority and dissenting opinions. Justice MARILYN KELLY argues that the Court of Appeals below "properly considered the results of all tests [including the absolute-disparity test], but decided that the comparative

---

[2] While these questions may seem a mere quibble to some, when judges are free to pick and choose among disparate tests, pointing to disparate constitutional conclusions, defendants and communities that are not significantly disparate may end up being treated in a disparate manner as a function of the judicial decision-making involved in: (a) choosing appropriate tests; (b) evaluating or considering such tests; and (c) reconciling such tests when they produce conflicting results.

disparity test was 'the most appropriate test to measure underrepresentation in this case,'" *post* at 7, quoting *People v Bryant*, 289 Mich App 260, 271; 796 NW2d 135 (2010), while the majority concludes that *Smith* requires more than simply alluding to a test and then failing to "consider" it.  One might think that such a difference of opinion could be easily resolved if there were some clear sense regarding *why* a particular test is or is not "appropriate" in furthering our understanding of whether "fair and reasonable" representation has been achieved, which, of course, would require a clear understanding of what is meant by "fair and reasonable" representation, which in turn would require a clear understanding of whether the constitutional task at hand is simply to calculate the divergence of actual representation on the venire from the "ideal" of proportional representation (an ideal certainly implied by the *Duren* concept of "underrepresentation")[3] and then apply some statistical equivalent of the "I know it when

---

[3] See also *Duren*, 439 US at 372 n * (Rehnquist, J., dissenting) (observing that if the fair-cross-section requirement "were truly an essential element of the due process right to trial by an impartial jury, a defendant would be entitled to a jury composed of [distinctive groups] in perfect proportion to their numbers in the community").  For a similar perspective, see Leipold, *Constitutionalizing jury selection in criminal cases: A critical evaluation*, 86 Geo L J 945, 965 (1998):

> A defendant is thus placed in a strange position: he is entitled to a jury drawn from a fair cross section specifically because it increases the odds that different groups and perspectives will be represented in the jury pool, which in turn helps ensure that the panel is impartial; when actually seating a jury, however, he may not take those same characteristics into account. He may not base his peremptory strikes on the very same proxy for viewpoints that the Court has already used to justify the cross-section requirement, even if his efforts are designed to bring about the exact benefit that the cross-section requirement provides. An

I see it" test once articulated by former United States Supreme Court Justice Potter Stewart in the realm of obscenity law. *Jacobellis v Ohio*, 378 US 184, 197; 84 S Ct 1676; 12 L Ed 2d 793 (1964) (Stewart, J. concurring).[4]

That is, even if I could clearly answer each of the aforementioned questions, and knew which tests to "consider" and how to give legal import to their results, it still would be difficult to apply *Duren* because the ultimate constitutional standard to which it is directed remains unclear. I know what the constitutional standard in "fair cross section" cases is *not*. It is not an equal-protection standard under which any "underrepresentation" resulting from intentional or purposeful discrimination in the jury venire is prohibited by the Constitution. See *Taylor*, 419 US at 526-528; *Duren*, 439 US at 368 n 26. And it is not a "proportional" representation standard under which *any* systematic exclusion that results in the "underrepresentation" of a "distinctive" group is prohibited by the Constitution, *Taylor*, 419 US at 538; *Duren*, 439 US at 364-- although references by the Supreme Court to "underrepresentation," "disproportion," and "representative[ness]" would certainly cause some judges to look in precisely that direction, absent the Court's admonition to the contrary. Thus, the "fair cross section" requirement, which purports to

attempt to support the cross-section requirement on impartiality grounds thus runs headlong into the rule that race or gender may not be used as a substitute for inclinations, biases, or possible votes.

[4] As did Justice Stewart, I also recognize that both this Court and the United States Supreme Court are quite possibly faced here with "the task of trying to define what may be indefinable." *Jacobellis*, 378 US at 197 (Stewart, J., concurring).

11

eschew both principles of nondiscrimination and proportional representation, must be premised on some alternative standard drawn from the Sixth Amendment's guarantee of an "impartial jury." See *Taylor*, 419 US at 526. But see *Berghuis*, 559 US at \_\_\_; 130 S Ct at 1396 (Thomas, J., concurring) (arguing that the fair-cross-section requirement "rests less on the Sixth Amendment than on an 'amalgamation of the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment'") (citations omitted).

Thus, some amount of "underrepresentation" is "fair and reasonable" and some amount is not, and the courts are to choose where the line is to be drawn. The problem is not that judges are ill equipped to determine what is "fair and reasonable," as such inquiries are made daily by judges in other constitutional contexts. In the context of the *Duren* test, however, there is no agreed-upon standard or "ideal" by which to measure the constitutional mandate of an "impartial jury" at the venire stage. The United States Supreme Court has stated that proportionality constitutes one relevant measure, but that it is also not required in order to satisfy the Constitution, which leads to uncertainty because there is also no agreed-upon standard by which to measure how close a venire must come to proportionality, or indeed even how one measures proportionality. What "systemic," but nondiscriminatory, deviations are acceptable under the Constitution, and what "systemic," but nondiscriminatory, deviations are not? Given this lack of clear external standards and the wealth of divergent statistical measurements available, how can a judge ensure that his or her own private sensibilities concerning what is "fair and reasonable" in the make-up of the venire do not come to prevail over what is required by the Constitution and that statistical tests do not come to be selected, and standards for

evaluating their results not come to be adopted, that merely tend to match those sensibilities? Focusing exclusively on the merits of the various tests obscures the forest for the trees, for without some clear sense of what the constitutional guarantee of an "impartial jury" requires at the venire stage, it will prove difficult, if not impossible, to achieve uniformity in the analyses of the composition of different venires. This, in turn, incurs the risk of making judicial determinations regarding "impartial juries" fraught with partiality and mathematical gamesmanship, while lending credence to Justice Rehnquist's concerns about a "constitutional numbers game." *Duren*, 439 US at 375 (Rehnquist, J., dissenting).

In the end, many trial and appellate judges have reviewed this case, and the question whether the venire here was "fair and reasonable" has closely divided them in favor of a negative response. While I have no doubt that each of these judges has addressed the question in this case "fairly and reasonably," and in accordance with his or her own best understanding of *Duren*, there seems to be little in the way of a coherent constitutional standard that distinguishes between "systematic exclusions" that violate the Constitution and "systematic exclusions" that do not, much less a clear statistical method for giving effect to this constitutional standard. And as a result, I believe that our decision-making in this realm resembles uncomfortably a judicial Rorschach test, in which the judge is ultimately required to look *inward* in determining what is "fair and reasonable," rather than *outward* to a comprehensible constitutional rule of law. In joining the majority opinion, and despite what I believe to be confusion concerning

13

aspects of the *Duren* test, I have sought to the best of my understanding of what is required by the United States Supreme Court to give reasonable meaning to this test and to the guarantees of the Constitution.


Stephen J. Markman

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

No. 141741

RAMON LEE BRYANT,

      Defendant-Appellee.

_____

CAVANAGH, J. (*dissenting*).

I respectfully dissent because I do not think that the Court of Appeals clearly erred by concluding that defendant is entitled to a new trial under the unique facts presented in this case.

I agree with Justice MARILYN KELLY that courts have not always applied *Duren v Missouri*, 439 US 357; 99 S Ct 664; 58 L Ed 2d 579 (1979), with precision and that reasonable minds can disagree regarding the proper application of *Duren*. Regardless of the debate raised in this case, however, I agree with Justice KELLY that defendant is nevertheless entitled to relief, even if a broader time frame for evaluating *Duren*'s second prong is considered.

As I explained in *People v Smith*, 463 Mich 199, 216, 222; 615 NW2d 1 (2000) (CAVANAGH, J., concurring), the approach taken by the Court of Appeals in *People v Hubbard (After Remand)*, 217 Mich App 459; 552 NW2d 493 (1996), should be a relevant consideration in determining whether unfair and unreasonable

underrepresentation has been shown. Specifically, "[w]hen the showing of underrepresentation is close, or none of the methods of analysis are particularly well-suited to a case," I believe courts should "glance ahead" to *Duren*'s third prong and consider a defendant's evidence of systematic exclusion. *Smith*, 463 Mich at 222. Under this approach, if the jury-selection process appears likely to systematically exclude a distinctive group, that is, the jury-selection process bears the mark of a nonbenign influence, a court may give a defendant the benefit of the doubt on underrepresentation. *Id.* at 218, 222-224. Applying this approach to the facts of this case, I agree with Justice KELLY's conclusion that the Court of Appeals did not clearly err by holding that defendant is entitled to a new trial.

The majority's decision to hastily adopt the "disparity of risk" test has also given me pause, when, as Justice KELLY aptly observes, the test was not addressed by the lower courts, was not briefed or argued to this Court, and, as the majority concedes, has not been endorsed by *any* court in the country. Thus, because the substantive merits of the disparity-of-risk test and the majority's 50 percent threshold[1] were not presented to this Court, I decline to pass judgment on the merits of the test at this time without the benefit of full briefing and oral argument.

Accordingly, I respectfully dissent.

Michael F. Cavanagh

---

[1] Indeed, aside from the fact that the issue was not raised or argued by the parties in this case, given the majority's conclusion that defendant's risk disparity falls below even the threshold proposed by the author first introducing the disparity of risk test, see *ante* at 37 n 102, I question whether it is necessary to adopt a higher threshold in this case.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v                                No. 141741

RAMON LEE BRYANT,

        Defendant-Appellee.

_____

MARILYN KELLY, J. (*dissenting*).

I concur with the majority that defendant satisfied the first and third prongs of the test for a fair-cross-section violation of the Sixth Amendment under *Duren v Missouri*.[1] However, I disagree that defendant failed to meet the second prong of *Duren*. Accordingly, I respectfully dissent from the majority's decision to reverse the judgment of the Court of Appeals.

The Court of Appeals used existing law and, for the most part, applied it properly. The majority opinion imputes error where there is none. Worse, it sua sponte introduces a "disparity of risk" test not accepted by any court in the country. The analysis the majority has set forth today neither improves nor clarifies this area of the law.[2]

_____

[1] *Duren v Missouri*, 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979).

[2] It is also altogether unnecessary. The error in the jury-selection process at issue here occurred between June 2001 and August 2002 as a result of a computer programming error. Accordingly, the number of cases raising this issue that remain in the appellate pipeline is likely low. The majority's decision today is dressed-up error correction, pure and simple.

The majority concludes that the Court of Appeals erred in two ways when evaluating the second prong of *Duren*. First, it considered the representation of African-Americans only in defendant's venire, not in multiple venires over time. Second, it misapplied our decision in *People v Smith*[3] by "effectively adopt[ing] a bright-line rule in favor of the comparative-disparity test in all instances in which the population of the distinct group is small."[4] With regard to the first contention, the majority does not make a persuasive case that the Court of Appeals erred. And the second allegation of error is based on an inaccurate statement of what the Court of Appeals did.

I generally agree with the majority that, under *Duren*, courts must consider the composition of venires over time. The Court of Appeals considered the specific disparity in the composition of defendant's venire when evaluating the second *Duren* prong. And it considered multiple venires over time when applying the third *Duren* prong.[5] I am not persuaded that this was erroneous.

Some of the authority the majority relies on undermines its conclusion. For example, if a distinctive group is not underrepresented in a defendant's particular venire, there is no cognizable Sixth Amendment claim. Thus, a distinctive group's underrepresentation in a defendant's particular venire is a necessary component of a Sixth Amendment claim. Accordingly, the composition of a defendant's particular venire must

---

[3] *People v Smith*, 463 Mich 199; 615 NW2d 1 (2000).

[4] *Ante* at 3.

[5] *People v Bryant*, 289 Mich App 260, 273-275; 796 NW2d 135 (2010) (applying the third *Duren* prong using data and statistics for venires over a three-month period).

2

be examined at some point in the *Duren* analysis.  Yet the majority's approach effectively ignores it.[6]

Other cases that the majority cites do not conclusively demonstrate that the composition of multiple venires over time must be considered under the second *Duren* prong rather than the third.  To the contrary, these cases seem to stand for the uncontroversial proposition that a defendant must show underrepresentation in multiple venires over time to satisfy the *Duren* test generally.[7]  Indeed, one of the majority's

---

[6] The majority asserts that its approach takes defendant's venire into account by "including it in the data set of venires used to calculate the degree of underrepresentation." *Ante* at 23 n 63.  But disparity in the composition of a defendant's particular venire must be shown in order to demonstrate that the defendant was harmed because a constitutional violation actually occurred.  Accordingly, the disparity in that particular venire must be considered independently, not simply lumped in with statistics concerning other venires.

[7] See, e.g., *United States v Miller*, 771 F2d 1219, 1228 (CA 9, 1985) ("[A] *violation of the fair cross-section requirement* cannot be premised upon proof of underrepresentation in a single jury.") (emphasis added); *United States v Allen*, 160 F3d 1096, 1103 (CA 6, 1998) ("Appellants have satisfied the first prong [of] the *Duren* test, but they *have not satisfied the other two*.") (emphasis added).  The majority asserts that *Duren* itself "compels" the majority's analysis of the second prong.  *Ante* at 21.  However, the quotations from *Miller* and *Allen*, coupled with the authority that I cite in footnote 9, demonstrate that courts have not applied *Duren* with precision.  Thus, the majority's analysis is far from a foregone conclusion.  It is also telling that the majority identifies few cases decided since 1979 that attribute such significance to the use of the plural "venires" in *Duren*'s discussion of the second-prong analysis. The reliance in these cases on the use of the plural is also undercut by statements in subsequent caselaw from the United States Supreme Court.  See, e.g., *Holland v Illinois*, 493 US 474, 478, 480; 110 S Ct 803; 107 L Ed 2d 905 (1990) ("It has long been established that racial groups cannot be excluded from the *venire* from which a jury is selected. . . .   [A] fair-cross-section *venire* requirement is imposed by the Sixth Amendment[.]") (emphasis added).

3

quotations from *Duren* supports this analysis.[8]  Moreover, cases not cited by the majority

contradict its conclusion and suggest that multiple venires over time are relevant to the

question of systematic exclusion rather than the question of underrepresentation.[9]

Consequently, I do not agree with the majority that *Duren* stands for the

proposition that "evaluating whether representation of a distinct group is fair and

reasonable requires evaluating venire composition over time."[10]  Rather, I believe that

evaluating whether *systematic exclusion* occurred requires looking for a pattern of

underrepresentation over time.  This makes sense because to show a constitutional flaw in

---

[8] See *ante* at 22, quoting *Duren*, 439 US at 366 ("Finally, *in order to establish a prima facie case*, it was necessary for petitioner to show that the underrepresentation of women, generally and on his venire, was due to their systematic exclusion in the jury-selection process.") (emphasis added).

[9] *State v Bowman*, 349 NC 459, 469; 509 SE2d 428 (1998) (noting in its discussion of the third *Duren* prong that the "[d]efendant's only evidence in the instant case consisted of the statistical makeup of this particular jury venire" and that "[s]tatistics concerning one jury pool, standing alone, are insufficient to meet the third prong of *Duren*"); *State v Holland*, 2009 Me 72, ¶ 39; 976 A2d 227, 239 (2009) (concluding that the defendant failed to meet the third *Duren* prong because "it is unknown how many African–Americans were in any jury pool other than [the defendant's]"); *United States v DeFries*, 327 US App DC 181, 189; 129 F3d 1293 (1997) ("Underrepresentation of a cognizable group in a single venire, without evidence of a greater pattern, *is insufficient to establish the 'systematic exclusion of the group'* required by *Duren* . . . .") (emphasis added); *United States v Hardwell*, 80 F3d 1471, 1486 (CA 10, 1996) ("[Defendant] has not shown that under-representation of African–Americans on his jury venire was the result of systematic exclusion, but simply argues that systematic exclusion can be inferred from the under-representation in a single venire.  This argument is without merit."); *United States v Jones*, 687 F2d 1265, 1269 (CA 8, 1982) ("Even assuming that the first two requirements have been met, there is no evidence of systematic exclusion in the jury selection procedure. . . .  No evidence was introduced regarding the composition of other venires in the district.").

[10] *Ante* at 23.

4

a jury-selection system, a defendant must show that the system *consistently* leads to unrepresentative venires. Indeed, in general it is the consistency of the system's failure to produce representative venires that proves systematic exclusion.[11]

Thus, the Court of Appeals did not err by using the comparative disparity in defendant's venire—73.1 percent—when applying the second prong of *Duren*.[12] And it appropriately evaluated the disparity in the racial composition of venires over time when applying the third *Duren* prong. The majority's first assignment of error is therefore without merit.

The majority's second criticism of the Court of Appeals' opinion is that it supposedly established "a bright-line rule favoring the comparative-disparity test" and disregarded the results of the other tests.[13] Respectfully, I believe that the majority misreads or mischaracterizes the Court of Appeals' opinion.

---

[11] *Duren*, 439 US at 366 ("[T]hat a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic . . . .").

[12] Other courts also examine the disparity between the racial composition of the community and the composition of the defendant's venire when applying the second *Duren* prong. See, e.g., *State v Hester*, 324 SW3d 1, 42-44 (Tenn, 2010) (applying the second *Duren* prong by calculating the disparity between the racial composition of the county's population and the racial makeup of the defendant's venire); *Bowman*, 349 NC at 467-468 (same); *Holland*, 2009 Me at ¶ 31; 976 A2d at 237-238 (same).

In any event, for reasons explained later in this opinion, I conclude that defendant established a Sixth Amendment fair-cross-section violation even if I use the three-month comparative disparity of 49.4 percent.

[13] *Ante* at 28.

The Court of Appeals did consider the results of both the absolute-disparity test and the standard-deviation test, but found both unhelpful to resolving defendant's appeal.[14] The majority determines that this was error, but offers little explanation why this is so. It repeats that *Smith* mandated that courts consider the results of all the tests when determining whether the second prong of *Duren* is met. But the Court of Appeals specifically recognized that *Smith* requires such an approach and did analyze the results of each test. It simply found the results of one test—the comparative-disparity test—most helpful. It does not follow that because the Court of Appeals ultimately settled on one test as most meaningful, it relied on that test without considering the others. Nothing supports the majority's sweeping assertion that the Court of Appeals established a bright-line rule in favor of the comparative-disparity test.

Moreover, in what respect does the majority think that the Court of Appeals should have further "regarded" the results of the absolute-disparity test? The panel correctly recognized that if the absolute-disparity test controlled, a successful Sixth Amendment fair-cross-section challenge would be impossible in cases like this one in which the minority population is small. Even the expert who testified at the evidentiary hearing concluded that an analysis of absolute disparity is not a viable method of

---

[14] See *Bryant*, 289 Mich App at 269 (concluding that "'the absolute disparity test is an ineffective measure of acceptable disparity' because of the low percentage of African–Americans who were eligible to vote in Kent County" and for that reason "declin[ing] to find the absolute-disparity test controlling in this case"), quoting *People v Hubbard (After Remand)*, 217 Mich App 459, 477; 552 NW2d 493 (1996) (citation omitted); *id.* at 272-273 ("[I]n this case, the standard-deviation test has little value in measuring the underrepresentation of African-Americans in Kent County jury venires.").

6

measuring underrepresentation in this case. Thus, I cannot see what further insight the majority believes that the Court of Appeals should have divined from the results of the absolute-disparity test.

When discussing the results of the standard-deviation test, the majority makes precisely the same error that it accuses the Court of Appeals of making. It notes the flaws in the standard-deviation test and decides to "afford the result of this test no weight."[15] It does so notwithstanding *Smith*'s mandate that courts consider the results of all three tests. This inconsistency highlights why the majority's criticism of the Court of Appeals in this respect is misplaced. *Smith* may mandate consideration of the results of all tests, but it does not dictate that a court give no more weight to one test than another. The Court of Appeals properly considered the results of all tests, but decided that the comparative-disparity test was "the most appropriate test to measure underrepresentation in this case."[16]

Finally, I cannot agree with the majority's importation of a fourth test—its disparity-of-risk test—into this appeal. First, no party or amicus curiae mentioned the disparity-of-risk test, let alone requested that we adopt it. Thus, the test was not properly considered by the parties or the courts below.[17] Second, as the majority notes, its test has yet to garner approval from a single court as a viable means to test Sixth Amendment

---

[15] *Ante* at 33.

[16] *Bryant*, 289 Mich App at 271.

[17] Because the propriety of this test is not properly before us, I decline the majority's invitation to indulge in a substantive critique of it. See *ante* at 37 n 103.

fair-cross-section claims. Despite these shortcomings, the majority sua sponte adopts it, applies it to this case, and declares that a violation occurs under that test when the disparity of risk exceeds 50 percent. The majority's decision to do so absent any advocacy, let alone vigorous advocacy, on the issue is highly questionable.

I believe that my analysis dispels the majority's findings of error by the Court of Appeals and demonstrates that the Court of Appeals correctly analyzed this case. The majority's sole remaining basis for reversing the Court of Appeals' judgment is its disagreement with that court's reliance on *People v Hubbard (After Remand)*.[18] I disagree that *Hubbard* should be partially overruled.

Under *Hubbard*, a court may consider the reason for a systematic exclusion when deciding whether representation of the distinctive group was fair and reasonable. If a jury-selection process systematically excludes a distinctive group on the basis of nonbenign factors, a court may give a defendant the benefit of the doubt on underrepresentation.[19] *Hubbard* borrowed this approach from *United States v Biaggi*[20] and *United States v Osorio*.[21] Although *Biaggi* and *Osorio* are not binding on this Court, they are persuasive. Moreover, contrary to the majority's conclusion that this approach

---

[18] *Hubbard*, 217 Mich App 459.

[19] *Id*. at 478, 481.

[20] *United States v Biaggi*, 909 F2d 662, 678 (CA 2, 1990).

[21] *United States v Osorio*, 801 F Supp 966 (D Conn, 1992).

8

"vitiates the three-part analysis,"[22] other courts have endorsed an analysis that merges the second and third *Duren* prongs in this fashion.[23]

Accordingly, I would follow *Hubbard*, as Justice CAVANAGH advocated in his concurring opinion in *Smith*.[24] Thus, I give defendant "the benefit of the doubt on underrepresentation" and "glance ahead" to the third *Duren* prong.[25] Unlike the defendant in *Smith*, defendant here has established that systematic exclusion occurred because the computer error that caused the exclusion was "inherent" in the jury-selection process used. As in *Hubbard*, the exclusion "did not result from 'benign' random selection, but, instead, resulted from a defect inherent in the juror allocation process . . . ."[26]

Because defendant established that systematic exclusion occurred and "the showing of underrepresentation is close,"[27] I conclude that defendant has established a prima facie violation of the Sixth Amendment's fair-cross-section requirement. The

---

[22] *Ante* at 40.

[23] *United States v Rioux*, 930 F Supp 1558, 1566 (D Conn, 1995) ("[T]he second and third prongs of the *Duren* test, unfair representation and systematic exclusion, are intertwined inextricably."); *Commonwealth v Arriaga*, 438 Mass 556, 566; 781 NE2d 1253 (2003) ("Evidence of a disparity smaller than 10% can support a conclusion of unconstitutional underrepresentation of smaller minority groups, *especially when coupled with persuasive evidence of systematic exclusion*.") (emphasis added).

[24] *Smith*, 463 Mich at 222-224 (CAVANAGH, J., concurring).

[25] *Id*. at 224.

[26] *Hubbard*, 217 Mich App at 481.

[27] *Smith*, 463 Mich at 222 (CAVANAGH, J., concurring); see also *id*. at 219 (identifying comparative disparities as large as forty percent as "borderline").

prosecution identifies no significant state interest that was advanced by the selection process that systematically excluded African-Americans from Kent County venires. Thus, defendant's Sixth Amendment claim should prevail.

Finally, we must not lose sight of the fact that the right at issue here—the right to a jury trial—is the cornerstone of the American justice system.[28] The right to be adjudged by a jury of one's peers is a precious part of that right.[29] The majority's careless decision imposes a new, wholly unnecessary restriction on this right by creating error where there is none and new law that no party has advocated.

For these reasons, I believe that the Court of Appeals correctly reversed defendant's convictions and remanded for a new trial. I would affirm its judgment.

Marilyn Kelly
Diane M. Hathaway

---

[28] "Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." *Blakely v Washington*, 542 US 296, 306; 124 S Ct 2531; 159 L Ed 2d 403 (2004).

[29] "Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." *Duncan v Louisiana*, 391 US 145, 156; 88 S Ct 1444; 20 L Ed 2d 491 (1968).